WARD GREENBERG HELLER & REIDY LLP
By:    Dennis R. Callahan, Esquire
        Amy L. Hansell, Esquire
701 East Gate Drive, Suite 220
Mount Laurel, NJ  08054
Phone:  (856) 866-8920
Fax:  (856) 866-8761

*Of Counsel:*
Christian C. Burden
**Quarles & Brady LLP**
101 East Kennedy Boulevard, Suite 3400
Tampa, FL 33602
Telephone: (813) 387-0300
Fax: (813) 387-1800
*Attorneys for Plaintiff, 7-Eleven, Inc.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| 7-ELEVEN, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>KRSM INC. and SYED KAZMI,<br><br>    Defendants. | CIVIL ACTION NO. 3:22-cv-7220 |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff, 7-Eleven, Inc. ("**7-Eleven**"), sues Defendants KRSM Inc.

("**KRSM**") and Syed Kazmi ("**Mr. Kazmi**") and alleges:

1

## Parties

1.      7-Eleven is a corporation organized and existing under the laws of the state of Texas with its principal place of business in Irving, Texas.

2.      KRSM is a New Jersey corporation with its principal place of business in Mercer County, New Jersey.

3.      Mr. Kazmi is an individual residing in and a citizen of Mercer County, New Jersey.

## Jurisdiction and Venue

4.      Subject matter jurisdiction in this matter is founded upon 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

5.      The Court also has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the parties to this action are diverse and the amount in controversy exceeds $75,000.00.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants operate the business that is the subject of this action in this District. Additionally, a substantial part of the events giving rise to this action occurred in this District.

**7-Eleven's System and Registered Marks**

7.     7-Eleven is an operator and franchisor of convenience store retail businesses.

8.     7-Eleven evolved from an ice company in the 1920s that began selling milk, eggs, and bread from an improvised storefront. The company's stores were originally known as "Tote'm Stores" but in 1946 the name of the stores was changed to "7-Eleven" to reflect the hours of operation—7 a.m. to 11 p.m.—and that name has been in continuous use since.

9.     7-Eleven has developed methods and procedures, called a "system", used in the operation of convenience store businesses. 7-Eleven's system is a comprehensive business format for the establishment and operation of high-standard convenience store businesses with distinctive features in products, services, distribution, accounting, training, and management assistance.

10.     7-Eleven's system is the culmination of decades of 7-Eleven's experience and investment of resources into its development and refinements.

11.     To identify the source, origin, and sponsorship of 7-Eleven® convenience stores and the services they offer, and to distinguish its convenience stores and associated products and services from those offered and sold by others, 7-Eleven has extensively used trademarks and service marks (the "**7-Eleven Marks**"), including without limitation:

| Mark | Registration Number | Effective Date |
|---|---|---|
| 7-ELEVEN | 718,016 | 7/4/1961 |
| 7-ELEVEN | 920,897 | 9/21/1971 |
| OH THANK HEAVEN FOR 7-ELEVEN | 1,008,307 | 1/17/1978 |
| SLURPEE | 829,177 | 7/8/1967 |
| BIG GULP | 1,110,172 | 12/26/1978 |
| 7-ELEVEN LOGO AND DESIGN | 896,654 | 8/11/1970 |

12.     The 7-Eleven Marks are registered on the Principal Register of the United States Patent and Trademark Office. The registrations continue in full force and effect and all those eligible are incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

13.     7-Eleven has given notice to the public of the registration of the 7-Eleven Marks as provided in 15 U.S.C. § 1111 and complies with all legal requirements to ensure that 7-Eleven and its authorized licensees remain the exclusive users of the 7-Eleven Marks.

14.     The 7-Eleven Marks, including the trade dress of red, orange, and green striping against a white field, are often part of the building structure in 7-Eleven® stores and inseparable from its realty. Even functional components of the equipment used in 7-Eleven® stores, such as fountain backsplashes and point-of-sale register terminals, contain the 7-Eleven® Marks.

15. 7-Eleven has continuously used the 7-Eleven Marks in interstate commerce in connection with the promotion and licensing of 7-Eleven® convenience stores and the services they offer throughout the United States, including in the State of New Jersey, since the date of their registration.

16. The services offered by 7-Eleven and its licensees under the 7-Eleven Marks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States, including in the State of New Jersey.

17. 7-Eleven has extensively advertised and promoted 7-Eleven® convenience stores and the services they offer under the 7-Eleven Marks throughout the United States and world, expending enormous resources and millions of dollars in advertising and other efforts to obtain and retain recognition and customer association of the 7-Eleven® marks with 7-Eleven® stores and speed, convenience, and quality.

### 7-Eleven® Franchising

18. 7-Eleven has been franchising since the 1960s and about three quarters of its United States stores are franchised. Through written franchise agreements, 7-Eleven licenses the use of its marks and its system of operating convenience stores to others, requiring them to operate uniformly and in accordance with 7-Eleven's specifications in order to protect 7-Eleven's image and brand.

19.     In exchange, a 7-Eleven® franchisee must pay to 7-Eleven a defined percentage of its gross profit (net sales less cost of goods sold), called the 7-Eleven Charge.

20.     Other salient features of the 7-Eleven® franchise system include:

A.     The Open Account: 7-Eleven extends financing to its franchisees for use in the operation of franchised stores. The amount financed by 7-Eleven and the balance due from its franchisee is maintained in an account defined in the franchise agreement as the "Open Account." Essentially, the Open Account is a running working capital account that carries the outstanding balance that 7-Eleven has loaned to the franchisee. In exchange for the financing provided by 7-Eleven, the franchisee grants a security interest to 7-Eleven in, among other things, the store's inventory and proceeds.

B.     Retail Information Systems: 7-Eleven® franchisees must use a proprietary Retail Information System computer system and software having various point-of-sale, inventory management, and back-office functions. Through this Retail Information System, a franchisee reports virtually all store transactions to 7-Eleven, including sales, inventory acquisitions and adjustments, payroll, etc.

C.     Inventory Reporting & Accounting: A franchisee can finance its purchase of store inventory through the Open Account or purchase inventory with cash. In either instance, the franchisee is obligated to report the inventory transaction and submit the related invoice to 7-Eleven.

D.     Cash Reports: 7-Eleven® franchisees must prepare and transmit to 7-Eleven a daily cash report ("Cash Report"). Among other things, the Cash Report sets forth the daily sales and whether those sales were for cash or credit. The Cash Report also accounts for deductions from cash receipts that affect the daily deposit, such as a franchisee's cash payment to a vendor to acquire merchandise for sale in the store.

E.     Daily Deposit: The cash receipts of the franchise business must be deposited into a bank account controlled by 7-Eleven. The Cash Report is a critical component of balancing the Store's transactions and ensuring the bank deposit amount equals the total cash receipts and other cash transactions conducted by the store.

F.    <u>Minimum Net Worth</u>: Most 7-Eleven® franchised stores must maintain a "Minimum Net Worth" of $10,000 or $15,000 depending on the date of their franchise agreement. A franchisee's "Net Worth" is essentially the sum total of its assets minus its liabilities. The Minimum Net Worth requirement is intended to protect 7-Eleven's investment in the store, its exposure for the Open Account, and to assure that 7-Eleven® franchisees are financially vested in the operation of their stores.

G.    <u>Monthly Financials</u>: 7-Eleven prepares monthly financial reports called "Financial Summaries" for each store from its bookkeeping records that accumulates and sorts the information reported to it concerning the franchisee's store operations, such as sales, expenses, inventory acquisitions, and paid-in capital contributions. The Financial Summaries include, among other things, an income statement, balance sheet, and calculation of the Open Account balance and Net Worth calculated in accordance with the provisions of the franchise agreement.

### **The Parties' Written Franchise Agreement**

21.    On or around November 14, 2018, KRSM entered into a franchise agreement, ancillary agreements, and addenda (collectively, the "**Franchise Agreement**") for the operation of 7-Eleven® Store No. 37039, located at 1601 Princeton Avenue in Lawrenceville, New Jersey (the "**Store**"). A true and correct copy of the Franchise Agreement is attached as Exhibit A.

22.    Mr. Kazmi, as the sole owner of KRSM, executed a Principals' Guaranty and Assumption Agreement (the "**Guaranty**"), guaranteeing the payment and performance of KRSM's obligations under the Franchise Agreement. A true and correct copy of the Guaranty is included in the document titled "Entity Franchisee Amendment to Franchise Agreement" that is appended to the Franchise Agreement.

23.    Prior to franchising the Store, 7-Eleven had selected the store location, acquired the property, and made physical improvements to the premises. 7-Eleven also outfitted the Store with equipment needed for the operation of a convenience store, such as coolers, soda fountains, grills, a safe, cash registers, and so on (the "**Equipment**").

24.    The Store's premises and Equipment are leased to Defendants through the Franchise Agreement.

25.    The lease provisions of the Franchise Agreement contain exclusive use clauses. The purpose of these clauses is to ensure that only a 7-Eleven® business is operated on premises where 7-Eleven has made these investments, that is, on real property it owns or has acquired via a long-term lease from a third party so that locational goodwill is retained and 7-Eleven property is used only for its intended purpose: to operate and use as a 7-Eleven® store.

26.    7-Eleven also provided financing to Defendants, including financing for the Store's inventory. Store inventory and other assets are subject to security interests in 7-Eleven's favor, which secure all indebtedness of Defendants to 7-Eleven.

### Defendants' Chronic Violations of the Franchise Agreement

27.    Beginning in early 2021, Defendants began to demonstrate a flagrant disregard for their contractual obligations and a willful refusal to adhere to 7-

Eleven's standards and specifications. Over many months, and despite increasing warnings and breach notices from 7-Eleven, Defendants' misconduct spread to nearly every aspect of Store operations, ranging from financial defaults and delinquent reporting to troubling noncompliance with basic foodservice and cleanliness requirements. Defendants' ongoing and acute violations of their contractual obligations caused 7-Eleven to issue eighteen (18) Notices of Material Breach as further described below.

### *Breach Notice #1–Minimum Net Worth Violation*

28. On January 28, 2021, Defendants received a Notice of Material Breach ("**Breach Notice #1**") based on their Minimum Net Worth violation.

29. As mentioned above (in paragraph 20(F)), all 7-Eleven franchisees must maintain a minimum equity investment in the franchised business at all times, described in the Franchise Agreement as Minimum Net Worth. The Franchise Agreement sets Defendants' Minimum Net Worth requirement at $10,000.

30. Without the Minimum Net Worth requirement, Defendants could draw to themselves the receipts of the business yet continue operations by using the credit offered by 7-Eleven through the Open Account.

31. The Store's Financial Summaries as of December 31, 2020 reflected a Net Worth of **negative** $14,893.98, meaning Defendants were **$24,893.98** below the minimum equity level required by the Franchise Agreement.

*Breach Notice #2—Image, Merchandise/Cleanliness*

32.    Defendants' financial defaults coincided with disturbing cleanliness violations and unacceptable merchandise conditions at the Store.

33.    The Franchise Agreement requires Defendants to operate the Store, including the Foodservice Facility, in compliance with 7-Eleven's Foodservice Standards and all applicable laws, regulations, and codes. Defendants also promised in the Franchise Agreement to maintain the Store in a clean and attractive condition, and that they would not commit any act that would adversely affect 7-Eleven, other 7-Eleven® franchisees, or the 7-Eleven Image.

34.    The Franchise Agreement also requires Defendants to carry, use and offer for sale inventory of the type, quality, and variety that 7-Eleven specifies in the Franchise Agreement, 7-Eleven's operations manual, and merchandising guides.

35.    7-Eleven's field personnel visit franchised stores regularly to ensure that the Franchise Agreement's operational obligations are adhered to. For instance, keeping shelves properly stocked with merchandise is vital to the sustaining image of the 7-Eleven® brand. Customers expect a consistent experience across all 7-Eleven® stores and, on a more basic level, product availability is a fundamental characteristic of the convenience store industry.

36. Despite these critical obligations, on January 28, 2021 7-Eleven issued a Notice of Material Breach ("**Breach Notice #2**") based on Defendants' failure to operate the Store consistent with the 7-Eleven Image and cleanliness requirements. During a Store visit on January 7, 2021, 7-Eleven observed a host of unacceptable conditions, including:

- Unclean roller grill;
- Unclean shelves;
- Unclean fresh bakery case;
- Unclean coffee makers;
- Unclean beverage drip trays;
- Unclean cabinets;
- Unclean napkin holders;
- Unclean beverage cup holders;
- Unclean vault;
- Unclean restroom;
- Unclean handwashing sink;
- Unclean floors and floormats;
- Stains on pavement; and
- Unclean outdoor trashcans.

37. The Store also had out-of-stock deficiencies in a variety of categories including hot food items, deli food items, fresh bakery items, and assorted chocolates and candies.

### *Breach Notice #3—Out-of-Code Product*

38. During the January 7, 2021 Store visit, 7-Eleven also observed that Defendants offered fresh food products for sale to guests past the out-of-code date, resulting in a third Notice of Material Breach ("**Breach Notice #3**").

11

39.     Explaining further, there is (or should be) a "use by" date or "code" printed on perishable food products in 7-Eleven® stores. 7-Eleven's Foodservice Standards (as well as health and safety laws and regulations) prohibit perishable food products from being offered for sale after the "use by" date or from ever being without a "use by" date.

40.     Despite this self-evident food safety requirement, Defendants made available for purchase out-of-code (i.e., expired) products, including roller grill items and burritos.

*Breach Notice #4—Image, Merchandise/Cleanliness*

41.     On April 9, 2021, 7-Eleven issued a fourth Notice of Material Breach ("**Breach Notice #4**"), again stemming from Defendants' failure to adhere to 7-Eleven's merchandise and cleanliness standards.

42.     During a Store visit on March 19, 2021, 7-Eleven observed significant cleanliness and out-of-stock conditions. The unacceptable sanitation and cleanliness issues included:

- Trash and debris scattered throughout the parking lot;
- Overflowing outdoor trashcans;
- Unclean counters;
- Unclean floors and floor mats;
- Unclean restroom;
- Unclean shelves;
- Unclean indoor trashcans;
- Unclean fresh bakery case;
- Unclean roller grill;

12

- Unclean hot foods case;
- Unclean fountain drink, Slurpee, and cappuccino machines; and
- Unclean vault.

43.    In addition, the out-of-stock deficiencies impacted the following categories of products:

- Beef jerky;
- Packaged bakery items;
- Breakfast food items;
- Nutritional bars;
- Packaged cookies and crackers;
- Assorted candies and chocolates;
- Assorted seeds and nuts;
- Ice cream in freezer; and
- Fresh deli food items.

### *Breach Notice #5—Minimum Net Worth*

44.    On May 6, 2021, 7-Eleven issued a fifth Notice of Material Breach ("**Breach Notice #5**) following another violation of the Minimum Net Worth requirement.

45.    The Store's Financial Summaries as of March 31, 2021 reflected a Net Worth of **<u>negative</u>** $25,596.48, meaning Defendants were **$35,596.48** below the minimum equity level required by the Franchise Agreement.

### *Breach Notice #6—Minimum Net Worth*

46.    On May 27, 2021, 7-Eleven issued a sixth Notice of Material Breach ("**Breach Notice #6**), again arising from Defendants' noncompliance with the Minimum Net Worth requirement.

47.     The Store's Financial Summaries as of April 30, 2021 reflected a Net Worth of **negative** $21,985.21, meaning Defendants were **$31,985.21** below the minimum equity level required by the Franchise Agreement.

### *Breach Notice #7—Late/Missing Cash Reports, Late/Missing Deposits*

48.     On March 24, 2022, 7-Eleven issued to Defendants a Notice of Material Breach ("**Breach Notice #7**") based on their failure to timely submit daily Cash Reports and corresponding failure to make timely bank deposits.

49.     As explained above (in paragraph 20(D)-(E)), Defendants' twin obligations to report Store transactions and deposit receipts is crucial to 7-Eleven's reconciliation of the Store's financial activity. In addition, Defendants promised in the Franchise Agreement to keep all Receipts in the Store safe and currency control devices before depositing with the bank.

50.     Defendants failed to comply with the terms of the Franchise Agreement because, on March 23, 2022, 7-Eleven conducted a cash audit at the Store and discovered that the Store's Receipts were not kept in the store safe and currency control devices prior to their deposit with the bank. Specifically, during the audit, 7-Eleven found $640.00 in an unsecured drawer and $595.50 in the manager's office.

51.     Likewise, at the time of the breach, Defendants had at least five missing Cash Reports, meaning they had not properly reported the Store's sales for nearly a week.

14

52. Because of Defendants' failure to complete and submit all Cash Reports, 7-Eleven also could not determine whether Defendants deposited the proper amounts due to be deposited with the bank or whether Defendants made timely deposits corresponding to the days Defendants had missing Cash Reports.

53. However, 7-Eleven observed that any deposits made by Defendants were habitually late. For example, the deposit due for the Cash Report date of February 7, 2022 did not occur until February 22, 2022 (14 days late), Defendants' deposit due for the Cash Report date of February 16, 2022 did not occur until March 7, 2022 (18 days late), and Defendants' deposit due for the Cash Report date of March 1, 2022 did not occur until March 18, 2022 (16 days late).

### *Breach Notice #8—Image, Cleanliness/FoodService Standards*

54. On May 17, 2022, Defendants received their eighth Notice of Material Breach ("**Breach Notice #8**"), again arising from their violations of 7-Eleven's cleanliness and foodservice standards.

55. The below list describes only **some** of the unacceptable cleanliness conditions 7-Eleven observed during a Store visit on April 21, 2022:

- Chili and cheese was not held at proper temperature and not properly code dated;
- Condiments were not properly code dated;
- Hot food was not properly code dated;
- Employees were not following proper food handling and handwashing procedures;
- Utensils were not properly stored in sanitizer between uses;

15

- Restroom was dirty, with the floor covered in urine;
- The toilet bowl was missing a lid;
- Shelves were dirty with evidence of rodent activity;
- Glides in the dairy door were covered with mold;
- Trash was scattered throughout the landscaped areas;
- Exterior trash cans were dirty and overflowing; and
- There was evidence of pest infestation.

### Breach Notice #9—Late/Missing Cash Reports, Late/Missing Deposits

56. On May 18, 2022, 7-Eleven issued a Notice of Material Breach ("**Breach Notice #9**) because Defendants again failed to timely submit Cash Reports and make timely bank deposits.

57. As of the date of the breach (May 17, 2022), there were at least **eleven** missing deposits totaling **$86,200.00**.

### Breach Notice #10—Minimum Net Worth

58. Defendants' financial defaults continued with a Notice of Material Breach ("**Breach Notice #10**") issued on May 18, 2022 for another Net Worth violation.

59. The Store's Financial Summaries as of April 30, 2022 reflected a Net Worth of **negative** $21,384.53, meaning Defendants were **$31,384.53** below the Net Worth required by the Franchise Agreement.

### Breach Notice #11—Foodservice Standards, Out-of-Code Product

60. On June 16, 2022, 7-Eleven issued a Notice of Material Breach ("**Breach Notice #11**") based on Defendants' repeated foodservice violations.

16

61.    During a May 26, 2022 Store visit, 7-Eleven observed out-of-code beverages and hot food, as well as hot food not properly coded with timers not set.

### Breach Notice #12—Late/Missing Deposits

62.    On July 11, 2022, Defendants received another Notice of Material Breach ("**Breach Notice #12**") based on their habitually late bank deposits.

### Breach Notice #13—Foodservice Standards, Out-of-Code Product

63.    July 28, 2022, Defendants against received a Notice of Material Breach ("**Breach Notice #13**") due to their ongoing failure to adhere to 7-Eleven's foodservice requirements.

64.    During a Store visit on July 11, 2022, 7-Eleven observed missing code dates on grill condiments, hot food timers were not set, hot food that was visually out-of-code, multiple expired beverages, coffee urn timers that did not work, and expired boxes of taquitos.

### Breach Notice #14—Image, Cleanliness, Foodservice Standards

65.    The July 11, 2022 Store visit also revealed a number of unsanitary and unacceptable cleanliness conditions, including rodent droppings on shelving in the Store.

66.    The visible filth and unclean conditions caused 7-Eleven to issue another Notice of Material Breach ("**Breach Notice #14**"), which was delivered to Defendants on July 28, 2022.

17

### *Breach Notice #15—Minimum Net Worth*

67.   All the while, Defendants continued to violate their financial obligations, leading 7-Eleven to issue a Notice of Material Breach ("**Breach Notice #15**") for yet another Minimum Net Worth violation.

68.   The Store's Financial Summaries as of June 30, 2022 reflected a Net Worth of **<u>negative</u>** $17,197, meaning Defendants were **$27,197** below the Net Worth required by the Franchise Agreement.

### *Breach Notice #16—Minimum Net Worth*

69.   On September 2, 2022, Defendants received another Notice of Material Breach ("**Breach Notice #16**"), again based on their now-routine violation of the Minimum Net Worth requirement.

70.   The Store's Financial Summaries as of July 31, 2022 reflected a Net Worth of **<u>negative</u>** $9,470, meaning Defendants were **$19,470** below the Net Worth required by the Franchise Agreement.

### *Breach Notice #17—Late Cash Reports, Late Deposits*

71.   On September 21, 2022, 7-Eleven issued a Notice of Material Breach ("**Breach Notice #17**"), again arising from Defendants' habitually late submission of Cash Reports and bank deposits.

*Breach Notice #18—Image, Cleanliness/Foodservice Standards*

72.     Also on September 21, 2022, 7-Eleven issued a Notice of Material Breach ("**Breach Notice #18**), citing Defendants again for many of the unacceptable filth and unsanitary conditions at the Store. Among other things—and despite observing the same vile conditions two months prior—the Store still had rodent droppings visible on interior shelves.

73.     Copies of Breach Notices #1 through #18 are attached as Composite Exhibit B.

## Termination of the Franchise Agreement

74.     On October 4, 2022, 7-Eleven delivered to Defendants a Notice of Material Breach and Termination ("**Termination Notice**"). A copy of the Termination Notice is attached as Exhibit C. The Termination Notice informed Defendants they again violated the Franchise Agreement by failing to comply with the Minimum Net Worth obligation, as their Net Worth as of August 31, 2022 was $16,493 less than the required $10,000 Minimum Net Worth.

75.     The Termination Notice also informed Defendants that 7-Eleven was terminating the Franchise Agreement, effective December 9, 2022, on account of Defendants' multiple, prior breaches of the Franchise Agreement.

76.     Defendants agreed in Section 26(a) of the Franchise Agreement that 7-Eleven may terminate the Franchise Agreement, without opportunity to cure, if

Defendants failed to comply with the Franchise Agreement on four or more separate occasions in the prior two years. Defendants' extensive and unrepentant pattern of noncompliance far exceeded any contractual right to cure.

**Defendants' Violation of Post-Termination Covenants and Infringement**

77.    Notwithstanding the Franchise Agreement's termination and 7-Eleven's demands, Defendants have refused to turn over and surrender the Store's premises, Equipment, and inventory as required.

78.    Instead, Defendants have continued to operate from the Store's premises a retail convenience store business, falsely holding out that business to the consuming public as an authorized and duly licensed 7-Eleven® store.

79.    To protect itself, 7-Eleven has advised its vendors that the store operated by Defendants is no longer a 7-Eleven®, despite its appearance otherwise, and that Defendants are not authorized to carry or purchase 7-Eleven's proprietary brands.

80.    The Store's condition and operations will deteriorate as time progresses because Defendants cannot comply with 7-Eleven's system.

81.    There is no reasonable way for a customer to know that Defendants' store is not authorized to use 7-Eleven's marks and is not associated with the 7-Eleven® system.  By all appearances, the Store remains, and its premises appear to be, a 7-Eleven® store, although it is not.

20

82.     It is impractical if not impossible for Defendants to sufficiently separate the distinguishing characteristics of the Store from 7-Eleven.  Consequently, unless Defendants are prohibited from continuing their operations, 7-Eleven's brand and image are at risk and will be impaired by a customer's negative views and association of experiences at the Store's location with the 7-Eleven® brand.

83.     7-Eleven is prevented from making productive use of its own property as a consequence of Defendants' conduct. In particular, Defendants have no right of continued possession of the premises or Equipment following termination of the Franchise Agreement.

### Defendant's Excessive Ordering and Abuse of Trust

84.     7-Eleven issued the Notice of Termination approximately two months before the effective date of termination on December 9, 2022.  This extended notice period is intended to allow franchisees like Defendants a reasonable time to orderly wind up and conclude their business operations.

85.     During this two-month period, 7-Eleven permitted Defendants' continued use and access of its business systems and extension of credit through the Open Account.

86.     As discussed above, the Open Account, among other things, calls for 7-Eleven to pay the Store's vendors including, for example, vendors who provide and

deliver merchandise for resale.  In other words, 7-Eleven pays for merchandise deliveries to the Store as part of its credit arrangement with Defendants.

87.    For a few weeks following the termination notice, Defendants' weekly purchases of merchandise were consistent with its historical purchase patterns. However, beginning in November 2022, Defendants' weekly merchandise purchases (again, that 7-Eleven pays for through its extension of credit via the Open Account) spiked to several hundred percent of its normal level.

88.    In particular Defendants' purchases of cigarettes increased more than 20 times Defendants' normal purchases volume during November 2022:

| Store 37039 Week Ending | 10/16/2022 | 10/23/2022 | 10/30/2022 | 11/6/2022 | 11/13/2022 | 11/20/2022 | 11/27/2022 | 12/4/2022 |
|---|---|---|---|---|---|---|---|---|
| Cigarette Purchases (Retail Value) | $6,744.60 | $5,325.30 | $4,021.10 | $31,160.90 | $25,283.90 | $47,097.90 | $45,989.70 | $88,316.00 |

89.    Upon learning of this substantial purchase aberration, 7-Eleven personnel also observed that the cigarette inventory was being removed from the Store by Defendants' employees without any transactions involving the sale of those cigarettes occurring.

90.    In this fashion, over the five weeks of operations of the Store leading to the termination date of December 9, 2022, Defendants over-ordered cigarettes by tens of thousands of dollars, which cigarettes 7-Eleven has paid-for.  The cigarettes, on which 7-Eleven has a security interest like all inventory of the Store, were then removed from the Store's premises without any sale or other transaction occurring.

91.     On December 9, 2022, in addition to arriving at the Store for purposes of taking possession as scheduled by the Termination Notice, 7-Eleven attempted to have a third-party audit and count the inventory of the Store, which Defendants refused to allow.   Nonetheless, it was then apparent that the Store's cigarette inventory had been diminished to only a fraction of what had been ordered (less sales) and received by the Store through Defendants' scheme.

92.     Defendants' scheme described above is tantamount to theft and a gross abuse of 7-Eleven's trust and good faith in continuing Defendants' access to the credit of the Open Account through the wind up period of Defendants' franchised business.

93.     As a consequence of Defendants' abusive conduct and as permitted by the Franchise Agreement, 7-Eleven notified Defendants on December 9, 2022 that it was forthwith terminating its financing of the Open Account and, in connection therewith, 7-Eleven demanded immediate payment of the Open Account's balance.

94.     Defendants have failed and refused to pay to 7-Eleven the Open Account Balance and otherwise failed and refused to account for the Store's inventory.

95.     All conditions precedent to bringing this suit have occurred, have been satisfied, or have been waived.

## COUNT I -- TRADEMARK INFRINGEMENT

96.     7-Eleven realleges paragraphs 1 through 85 above.

97.     The marks being used by Defendants are identical to 7-Eleven's marks.

98.     Defendants offer identical goods to the public and moves in identical channels of trade as 7-Eleven and duly licensed 7-Eleven® franchisees.

99.     Defendants' use of 7-Eleven's marks is without any oral or written consent of 7-Eleven and is likely to cause mistake or confusion in the minds of the public in violation of 15 U.S.C. § 1114(1)(a).

100.    Defendants' actions charged above are being done knowingly and intentionally to cause confusion, mistake, or to deceive.

101.    Defendants have profited from their acts of infringement and 7-Eleven has suffered damages.

102.    7-Eleven is without an adequate remedy at law because its marks are unique and represent to the public the identity, reputation, and goodwill of 7-Eleven and its authorized franchisees, such that damages alone cannot adequately compensate for Defendants' misconduct.

103.    Unless enjoined, Defendants and those acting in concert with them will continue to use and infringe upon 7-Eleven's marks. This threat of future injury to 7-Eleven's business identity, goodwill, and reputation requires injunctive relief to

24

prevent Defendants' continued use of 7-Eleven's marks and to ameliorate and mitigate the harm being caused to 7-Eleven.

## COUNT II - UNFAIR COMPETITION

104. 7-Eleven realleges paragraphs 1 through 103 above.

105. Defendants' use of 7-Eleven's marks along with any colorable variation thereof constitutes a passing off of the goods of Defendants as those of 7-Eleven in violation of 15 U.S.C. § 1125(a).

106. By reason of the foregoing, 7-Eleven is substantially injured in its business, including harm to the goodwill associated with its marks.

107. Defendants' actions charged above are being done knowingly and intentionally to cause confusion, mistake, or to deceive.

108. 7-Eleven is without an adequate remedy at law because its marks are unique and represent to the public the identity, reputation, and goodwill of 7-Eleven and its authorized franchisees, such that damages alone cannot adequately compensate for Defendants' misconduct.

109. Unless enjoined, Defendants and those acting in concert with them will continue to use and infringe upon 7-Eleven's marks. This threat of future injury to 7-Eleven's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of 7-Eleven's marks and to ameliorate and mitigate the harm being caused to 7-Eleven.

## COUNT III -- LANHAM ACT – TRADEMARK DILUTION

110.   7-Eleven realleges paragraphs 1 through 109 of its Complaint as if fully set forth herein.

111.   The 7-Eleven Marks are famous.

112.   Defendants' acts, practices, and conduct constitute a use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the 7-Eleven Marks, and Defendants' sale, offering for sale, distribution or advertising of non-conforming goods under the 7-Eleven Marks causes dilution of the distinctive quality of the 7-Eleven marks, in violation of 15 U.S.C. § 1125(c).

113.   As a direct and proximate result of Defendants' dilution of the 7-Eleven Marks, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

114.   7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique   and represent to the public 7-Eleven's identity, reputation, and goodwill, such that damages alone cannot fully compensate 7-Eleven for Defendants' misconduct.

115.   Unless enjoined by the Court, Defendants will continue to use and dilute the 7-Eleven Marks, to 7-Eleven's irreparable injury.  This threat of ongoing, irreparable injury to 7-Eleven's business identity, goodwill, and reputation requires

26

injunctive relief to prevent Defendants' continued dilution of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## COUNT IV -- BREACH OF POST-TERMINATION OBLIGATIONS

116.  7-Eleven realleges paragraphs 1 through 115 above.

117.  KRSM and 7-Eleven are parties and signatories to the Franchise Agreement.

118.  KRSM has breached the Franchise Agreement's post-termination obligations, including without limitation those specified in Paragraphs 28(a) by, among other things:

119.  Failing to surrender the Store and the Equipment;

120.  Failing to transfer to 7-Eleven the Store's inventory; and

121.  Failing to cease using the 7-Eleven marks and system.

122.  As a direct and proximate result of these breaches, 7-Eleven has been substantially and irreparably injured.

123.  7-Eleven is being deprived of the beneficial use of its real property and Equipment, and its business identity, customer and locational goodwill and reputation are impaired by KRSM's conduct and continued possession. KRSM is exacerbating this harm by operating and holding out her business as a 7-Eleven® store, when it is not.

124.    7-Eleven is without an adequate remedy at law to address this harm and protect its interests, and until KRSM is ordered to abide by the post-termination promises it made to 7-Eleven, it will continue to suffer substantial, irreparable injury to its business and reputation.

## COUNT V – EVICTION/REMOVAL OF TENANT

125.    7-Eleven realleges paragraphs 1 through 124 above.

126.    By its Notice of Termination delivered on October 4, 2022 and effective on December 9, 2022, 7-Eleven also terminated the lease of the Store premises incorporated in the Franchise Agreement along with any right of Defendants' further possession or interest therein.

127.    Notwithstanding termination of the lease and demand that Defendants quit the premises, Defendants have failed and refused to do so.

128.    7-Eleven is being, and will continue to be, irreparably damaged and injured by the aforementioned practices of Defendants, including interference with 7-Eleven's property rights, and unless Defendants are directed to quit and deliver to 7-Eleven possession of the Store, including the Equipment and Inventory, 7-Eleven will be caused irreparable injury and damage.

129.    7-Eleven has no adequate remedy at law.

## COUNT VI -- BREACH OF FRANCHISE AGREEMENT (DAMAGES)

130.    7-Eleven realleges paragraphs 1 through 129 above.

28

131.  In the Franchise Agreement, KRSM promised to:

A.  Maintain at all times during the Term of the Franchise Agreement a Minimum Net Worth of at least $10,000.00;

B.  Operate the Store only pursuant to the 7-Eleven System, and in a manner that will enhance the 7-Eleven Image;

C.  Carry, use and offer for sale at the Store only the Inventory and other products that are consistent with the type, quantity, quality and variety associated with the 7-Eleven Image and as 7-Eleven specifies in the Franchise Agreement;

D.  Comply with all of 7-Eleven's standards and specifications for all Inventory, including Proprietary Products, Required Categories, and other products and services carried, used or offered for sale at the Store;

E.  Maintain the Store, 7-Eleven Equipment, other property in the Store and landscaped areas in a clean, attractive, orderly, safe, and sanitary condition and in good repair and operating condition;

F.  Operate the Store, including the Foodservice Facility, at all times in compliance with the 7-Eleven Foodservice Standards and in compliance with all applicable laws, regulations and codes, including the U.S. Food & Drug Administration Model Food Code;

G.  Maintain a high ethical standard in the conduct of the franchised business and in the operation of the Store;

H.  Not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, the 7-Eleven Image, or the 7-Eleven System (as defined in the Franchise Agreement);

I.  Devote its best efforts to the business of the Store and maximization of the Store's sales and gross profit, and cause the Store to be operated only pursuant to the 7-Eleven System and in a manner that will enhance the 7-Eleven Image; and

J.  Pay its open account balance upon the discontinuance of 7-Eleven's financing.

132.   KRSM breached each of its above obligations, causing 7-Eleven to suffer damages.

## COUNT VII -- RECOVERY OF CHATTELS

133.   7-Eleven realleges paragraphs 1 through 132 above.

134.   7-Eleven holds a perfected security interest in the inventory and proceeds of the Store.

135.   The security agreement for the Store provides that, upon termination of the Franchise Agreement, KRSM must assemble the collateral and make it available to 7-Eleven at the Store. Further, 7-Eleven has the right to take possession of the collateral in the event of default.

136.   On December 9, 2022, 7-Eleven exercised its right under the Franchise Agreement to discontinue the financing of any unpaid balance in the Open Account at the Store and demanded immediate repayment of the unpaid balance in the Open Account.

137.   As a consequence of KRSM's failure to pay the unpaid balance, 7-Eleven has made demand, pursuant to the Franchise Agreement, that KRSM permit 7-Eleven to take immediate possession of the Equipment, Inventory and its proceeds at the Store.

138.   KRSM has declined to voluntarily vacate the Store and has wrongfully refused to turn over 7-Eleven's property to it.

139. As a direct result of KRSM's actions as set forth above, 7-Eleven's security interest has been harmed.

140. 7-Eleven will be irreparably injured if KRSM is permitted to retain possession of the Equipment, Inventory, proceeds, and other property subject to its security interest and has no adequate remedy at law for such injury.

141. Pursuant to Federal Rule of Civil Procedure 64, expressly permitting this Court to order a recovery of chattels by 7-Eleven under New Jersey law, 7-Eleven files this claim for recovery of chattels against KRSM who has unjustly detained all Inventory, supplies, sales proceeds, Equipment and fixtures of the Store, in which property 7-Eleven has a valid security interest. Such property is estimated to have a retail value in excess of $75,000.00.

## COUNT VIII -- BREACH OF GUARANTY

142. 7-Eleven realleges paragraphs 1 through 123 of its Complaint as if fully set forth herein.

143. Mr. Syed executed the Guaranty in favor of 7-Eleven.

144. Under the Guaranty, Mr. Syed unconditionally and absolutely guaranteed the prompt and full payment of liabilities of KRSM under the Franchise Agreement and the performance of all obligations by KRSM under the Franchise Agreement.

145.   KRSM breached the Franchise Agreement, and Mr. Syed breached the Guaranty by failing to honor its terms, including by their failure to pay the amounts owing to 7-Eleven and failing to abide by the post-termination obligations.

146.   7-Eleven has been damaged by Mr. Syed's breaches of the Guaranty.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, 7-Eleven, Inc. requests the following relief:

A.   An order preliminarily and permanently enjoining Defendants, their agents, servants and employees, and those people in active concert or participation with them, from:

1.   Using the 7-Eleven marks or any trademark, service mark, logo or trade name that is confusingly similar thereto;

2.   Otherwise infringing upon 7-Eleven's marks or using any similar designation, along or in combination with any other components;

3.   Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of Defendants' business, goods, or services; and

4.   Causing a likelihood of confusion or misunderstanding as to Defendants' affiliation, connection or association with 7-Eleven and its franchisees or any of their goods and services.

B.   An order, pursuant to 15 U.S.C. § 1118, that all labels, signs, prints, packages, wrappers, receptacles, uniforms, logo items, and advertisements in the possession of Defendants, their affiliates, subsidiaries, officers, agents, servants and employees, and those people in active concert or participation with them bearing 7-Eleven's marks, and all plates, molds, and other means of making the same, if any, be delivered to 7-Eleven at Defendants' cost;

C.   An order requiring Defendants to eliminate their advertising

under 7-Eleven's marks or any other confusingly similar designations from all media including, but not limited to, websites, newspapers, flyers, coupons, promotions, signs, telephone books, telephone directory assistance listings and mass mailings, all at Defendants' cost;

D.    An order requiring Defendants to file with the Court and to serve upon 7-Eleven's counsel within thirty (30) days after entry of any injunction or order, a written report, under oath, setting forth in detail the manner in which they have complied with such injunction or order;

E.    An award and judgment for damages, including all profits made by Defendants, caused by Defendants' infringement and unfair competition;

F.    An order preliminarily granting 7-Eleven possession of the Store and permitting it to assume operation of the Store pending a trial on the merits of the case;

G.    An award and judgment for possession of the Store premises and such writs and executions as may be necessary to aid 7-Eleven in dispossessing Defendants from the same;

H.    An order and judgment for replevin of the Equipment leased to KRSM and such writs and executions as may be necessary to aid 7-Eleven in dispossessing KRSM from the same;

I.    An award and judgment for damages arising from Defendants' breach of the Franchise Agreement and Guaranty;

J.    An award to 7-Eleven of its attorneys' fees and costs pursuant to the Lanham Act and the Franchise Agreement; and

K.    Such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

**WARD GREENBERG HELLER & REIDY LLP**


s/Dennis R. Callahan
Dennis R. Callahan
Amy L. Hansell
701 East Gate Drive
Mt. Laurel, NJ 08054
Telephone: (856) 866-8920
Fax: (856) 866-8761

*Of Counsel:*

Christian C. Burden
**Quarles & Brady LLP**
101 E. Kennedy Boulevard, Suite 3400
Tampa, Florida 33602
Telephone: (813) 387-0300
Fax: (813) 387-1800

*Attorneys for Plaintiff 7-Eleven, Inc.*

34