**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **7 ELEVEN, INC.,** | |
| Plaintiff, | Civil Action No. 22-7220 (ZNQ) (LHG) |
| v. | **OPINION** |
| **KRSM INC.,** *et. al.***,** | |
| Defendants. | |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon a Motion for a Preliminary Injunction filed by Plaintiff 7 Eleven, Inc. ("Plaintiff" or "7-Eleven") ("the Motion", ECF No. 5) pursuant to Fed. R. Civ. P. 65 and Local Rule 65.1. Plaintiff filed a memorandum of law in support of the Motion ("Moving Br.", ECF No. 5-1). Defendants KRSM Inc. and Syed Kazmi (collectively, "Defendants") opposed the Motion ("Opp'n Br.", ECF No. 20), and Plaintiff replied ("Reply Br.", ECF No. 25).

The Court has carefully considered the parties' submissions and decided the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT the Motion for a Preliminary Injunction.

### I.       BACKGROUND AND PROCEDURAL HISTORY

On December 10, Plaintiff filed a Complaint ("Compl.", ECF No. 1) seeking injunctive relief and monetary damages against Defendants for violating their Franchise Agreements.

1

Plaintiff is a corporation organized and existing under the laws of Texas, with its principal place of business in Irving, Texas. (Compl. ¶ 1.) Plaintiff is an operator and franchisor of convenience store retails businesses. (*Id*. ¶ 7.) The Complaint alleges the following facts:

Defendant KRSM Inc. ("KRSM") is a New Jersey Corporation with its principal place of business in Mercer County, New Jersey. (*Id*. ¶ 2.) Defendant Syed Kazmi ("Kazmi") is a citizen of Mercer County, New Jersey. (*Id*. ¶ 3.)

Plaintiff has developed methods and procedures, called a "system," used in the operation of convenience store businesses. (*Id*. ¶ 9.) Plaintiff has extensively used trademarks and service marks ("the 7-Eleven Marks") since 1961 to distinguish its convenience stores and associated products and services from those offered and sold by others. (*Id*. ¶ 11.)

Plaintiff has been franchising since the 1960s and about three quarters of its United States stores are franchised. (*Id*. ¶ 18.) Through written franchise agreements, to protect 7-Eleven's image and brand, 7-Eleven licenses the use of its Marks and its system of operating convenience stores to franchisees, requiring them to operate uniformly and in accordance with certain specifications. (*Id*.) In exchange, a 7-Eleven franchisee must pay 7-Eleven a defined percentage of its gross profit. (*Id*. ¶ 19.) 7-Eleven's franchise system also includes the following: an Open Account, Retail Information Systems, Inventory Reporting & Accounting, Cash Reports, Daily Deposit, Minimum Net Worth, and Monthly Financials. (*Id*. ¶ 20.) The Open Account permits 7-Eleven to extend financing to its franchisees to use in the operation of the franchised stores. (*Id*. ¶ 20(A).) The Open Account is a running working capital account that carries out the outstanding balance that 7-Eleven has loaned the franchisee. (*Id*.) In exchange, the franchisee grants a security interest to 7-Eleven in, amongst other things, the store's inventory and proceeds. (*Id*.)

On or around November 14, 2018, KRSM entered into a franchise agreement, ancillary agreements, and addenda (collectively, the "Franchise Agreement", ECF No. 1-1) for 7-Eleven Store No. 37039 located at 1601 Princeton Avenue, Lawrenceville, New Jersey (the "Store"). (*Id.* ¶ 21.) Kazmi, the sole owner of KRSM, executed a Principals' Guaranty and Assumption Agreement, guaranteeing the payment and performance of KRSM's obligations under the Franchise Agreement. (*Id.* ¶ 22.) Prior to franchising the Store, Plaintiff had selected the location, acquired the property, made physical improvements to the premises, and outfitted the equipment needed for the Store's operation (the "Equipment"). The Store's premises are leased to Defendants through the Franchise Agreement. (*Id.* ¶ 24.) The lease provisions of the Franchise Agreement contain an exclusivity clause to ensure that only 7-Eleven business is operated on the premises. (*Id.* ¶ 25.) Plaintiff also provided financing for the Store's inventory to Defendants, securing Defendants' indebtedness to 7-Eleven. (*Id.* ¶ 26.)

Plaintiff claims that in early 2021, Defendants began to fail to adhere to their contractual obligations and 7-Eleven's standards and specifications. (*Id.* ¶ 27.)

On January 28, 2021, Defendants received a Notice of Material Breach ("Breach Notice #1", ECF No. 1-2 at 2) based on a violation of their Minimum Net Worth requirement. (*Id.* ¶ 28.) According to the Franchise Agreement, Defendants must maintain the Store's minimum net worth of $10,000. (*Id.* ¶ 29.) The Store's Financial Summaries as of December 31, 2020 reflected a net worth of negative $14,893.98. (*Id.* ¶ 31.)

Plaintiff additionally alleges that Defendants' financial defaults coincided with "disturbing cleanliness violations and unacceptable merchandise conditions at the Store." (*Id.* ¶ 31.) The Franchise Agreement requires Defendants to operate the Store including the Foodservice Facility, in compliance with 7-Eleven's Foodservice Standards and all applicable laws, regulations, and

codes. (*Id.* ¶ 33.) Plaintiff maintains that Defendants promised in the Franchise Agreement to maintain the Store in a clean and attractive condition, and that they would not commit any act that would adversely affect 7-Eleven, other 7-Eleven franchisees, or the 7-Eleven image. (*Id.*) Further, the Franchise Agreement requires Defendants to carry, use, and offer for sale inventory of the type, quality, and variety that 7-Eleven specifies in the Franchise Agreement, 7-Eleven's operations manual, and merchandising guides. (*Id.* ¶ 34.) Plaintiff alleges that on January 28, 2021, it issued a second Notice of Material Breach ("Breach Notice #2) based on Defendants' failure to operate the Store consistent with the 7-Eleven image and cleanliness requirement. (*Id.* ¶ 36.) Plaintiff claims that on January 7, 2021 during a Store visit, Plaintiff observed a "host of unacceptable conditions." (*Id.*) The Store also had out-of-stock deficiencies in a variety of categories. (*Id.* ¶ 37.)

Also, during the January 7, 2021 visit, Plaintiff observed that Defendants offered fresh food products for sale to guests past the out-of-code date, resulting in a third Notice of Material Breach ("Breach Notice #3). (*Id.* ¶ 38.) Despite 7-Eleven's Food Service Standards prohibiting perishable food products from being offered for sale after the use-by date, Defendants made available expired products. (*Id.* ¶¶ 39, 40.)

On April 9, 2021, Plaintiff issued a fourth Notice of Material Breach ("Breach Notice #4) stemming from Defendants' failure to adhere to 7-Eleven's merchandise and cleanliness standards after a Store visit on March 19, 2021. (*Id.* ¶¶ 41, 41.)

On May 6, 2021, Plaintiff issued a fifth Notice of Material Breach ("Breach Notice #5", ECF No. 1-2 at 17) following another violation of the Minimum Net Worth requirement. (*Id.* ¶ 44.) Plaintiff alleges that the Store's financial summaries as of March 31, 2021 reflected a net worth of negative $25,596.48. (*Id.* ¶ 45.)

On May 27, 2021, Plaintiff issued a sixth Notice of Material Breach ("Breach Notice #6", ECF No. 1-2 at 20) for again failing to comply with the minimum net worth requirement. (*Id*. ¶ 46.) Plaintiff claims the Store's financial summaries as of April 30, 2021 reflected the Store's net worth as negative $21,985.21. (*Id*. ¶ 47.)

On March 24, 2022, Plaintiff issued a seventh Notice of Material Breach ("Breach Notice #7") based on Defendants' failure to timely submit daily cash reports and corresponding failure to make timely bank deposits. (*Id*. ¶ 48.) The Franchise Agreement requires Defendants to report Store transactions and deposit receipts, keep all receipts in the store safe, and currency control devices before depositing with the bank. (*Id*. ¶ 49.) On March 23, 2022, Plaintiff conducted a cash audit at the Store. (*Id*. ¶ 50.) Plaintiff claims that the Store's receipts were not kept in the Store's safe and currency control devices prior to their deposit with the bank. (*Id*.) Plaintiff alleges that it found $640.00 in an unsecured drawer and $595.50 in the manager's office, and at least five missing cash reports. (*Id*. ¶¶ 50, 51.) Plaintiff also observed that any deposits made by Defendants were habitually late. (Id ¶ 53.)

On May 17, 2022, Plaintiff issued an eighth Notice of Material Breach ("Breach Notice #8) arising from Defendant's violations of 7-Eleven's cleanliness and foodservice standards. (*Id*. ¶ 54.)

On May 18, 2022, Plaintiff issued a ninth Notice of Material Breach ("Breach Notice #9) due to Defendant's failure to timely submit cash reports and make timely bank deposits. (*Id*. ¶ 56.) As of May 17, 2022, Plaintiff alleges Defendants were missing at least eleven deposits, totaling $86,200.00. (*Id*. ¶ 57.) Plaintiff issued a tenth Notice of Material Breach ("Breach Notice #10", ECF No. 1-2 at 31) the same day for Defendants' net worth violation. (*Id*. ¶ 58.) Plaintiff

maintains that the Stores' financial summaries as of April 30, 2022 reflected a net worth of negative $21,384.53.  (*Id*. ¶ 58.)

On June 16, 2022, Plaintiff issued an eleventh Notice of Material Breach ("Breach Notice #11") after a May 26, 2022 Store visit where Plaintiff observed out-of-code beverages and hot food, in violation of foodservice regulations.  (*Id*. ¶¶ 60, 61.)

On July 11, 2022, Defendants received a twelfth Notice of Material Breach ("Breach Notice #12") due to habitually late bank deposits.  (Id. ¶ 62.)

On July 28, 2022, Plaintiff issued a thirteenth Notice of Material Breach ("Breach Notice #13") based on Defendants' ongoing failure to adhere to 7-Eleven's foodservice requirement.  (*Id*. ¶ 63.)  Specifically, Plaintiff observed missing code dates on grill condiments, hot food timers were not set, hot food that was visually out-of-code, multiple expired beverages, coffee urn timers that did not work, and expired boxes of taquitos during a Store visit on July 11, 2022.  (*Id*. ¶ 64.)

Plaintiff also claims to have observed visible filth and unclean conditions during its July 11, 2022 Store visit, including rodent droppings on shelves.  (*Id*. ¶ 65.)  A Notice of Material Breach ("Breach Notice #14) was therefore issued.  (*Id*. ¶ 66.)

The Store's financial summaries as of June 30, 2022 reflected a net worth of negative $17,917.  Plaintiff therefore issued a fifteenth Notice of Material Breach ("Breach Notice #15", ECF No. 1-2 at 47).

On September 2, 2022, Defendants received another Notice of Material Breach ("Breach Notice #16", ECF No. 1-2 at 50) for again violating the minimum net worth requirement.  (*Id*. ¶ 69.)  The Store's financial summaries as of July 31, 2022 reflected a net worth of negative $9,470.  (*Id*. ¶ 70.)

Plaintiff issued a seventeenth Notice of Material Breach ("Breach Notice #17", ECF No. 1-2 at 53) on September 21, 2022 arising from Defendants' late submission of cash reports and bank deposits.  (*Id*. ¶ 71.)  Plaintiff also issued a Notice of Material Breach on the same date (Breach Notice #18, ECF No. 1-2 at 56) for the Store's "unacceptable filth and unsanitary conditions." (*Id*. ¶ 72.)  Plaintiff again observed rodent droppings on interior shelves.  (*Id*.)

On October 4, 2022, Plaintiff issued Defendants a Notice of Material Breach and Termination ("Termination Notice", ECF No. 1-3) informing Defendants that they again failed to comply with the minimum net worth obligation and terminating the Franchise Agreement, effective December 9, 2022.  (*Id*. ¶¶ 74, 75.)

The Franchise Agreement indicated that 7-Eleven may terminate the Franchise Agreement, without opportunity to cure, if Defendants failed to comply with the Franchise agreement on four or more separate occasions within two years.  (*Id*. ¶ 76.)

While Plaintiff terminated the Franchise Agreement, Plaintiff claims Defendants have refused to turn over and surrender the Store's premises, Equipment, and inventory.  (*Id*. ¶ 77.)  Defendants have continued to operate a convenience store business from the Store's premises, falsely holding out the business to the public as a 7-Eleven store, using 7-Eleven's  Marks and system.  (*Id*. ¶¶ 78, 81.)

In November of 2022, following the issuance of the Termination Notice, Defendants' weekly merchandise purchases spiked to several hundred percent of its normal level.  (*Id*. ¶ 87.)  In particular, Defendants' purchases of cigarettes increased more than 20-times Defendants' normal purchase volumes.  (*Id*. ¶ 88.)  7-Eleven personnel observed that the cigarette inventory was being removed from the Store by Defendants' employees without any transactions involving the sale of those cigarettes occurring.  (*Id*. ¶ 89.)

On December 9, 2022, 7-Eleven arrived at the Store for purposes of taking possession as scheduled by the Termination Notice.  (*Id*. ¶ 91.)  That same day, Plaintiff attempted to have a third-party audit and count the inventory of the Store, which Defendants refused to permit.  (*Id*.)  Plaintiff additionally notified Defendants that it was terminating its financing with the Open Account and, in connection therewith, demanded immediate payment of the Open Account's balance.  (*Id*. ¶ 93.)  Defendants have failed and refuse to pay the Open Account Balance and otherwise failed and refused to account for the Store's inventory.  (*Id*. ¶ 94.)

On December 10, 2022, Plaintiff filed a Complaint asserting eight claims: Trademark Infringement (Count I); Unfair Competition (Count II); Lanham Act – Trademark Dilution (Count III); Breach of Post-Termination Obligations (Count IV); Eviction/Removal of Tenant (Count V); Breach of Franchise Agreement (Damages) (Count VI); Recovery of Chattels (Count VII); and Breach of Guaranty (Count VIII).  On December 13, 2022, Plaintiff filed the instant Motion for a Preliminary Injunction.  (*See* ECF No. 5.)

## II.    <u>LEGAL STANDARD</u>

To obtain a preliminary injunction, the moving party must demonstrate: "(1) the reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted.  Moreover, the district court also should take into account, when relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.  *South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 274 F.3d 771, 777 (3d Cir. 2001).  "[A] district court—in its sound discretion—should balance those four factors so long as the party seeking the injunction meets the threshold on the first two."  *Id.* (citing *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975)).  It follows that a "failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a

preliminary injunction." *See id.* at 777 (citing *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir.1982)).  As a threshold matter, the Court therefore considers the first two prongs together.  Only when a plaintiff has sufficiently met the first two prongs, does the Court consider the third prong relating to the possibility of harm to other parties and finally, evaluate whether public interest is served by granting injunctive relief.

## III.   JURISDICTION

The Court exercises subject matter jurisdiction over Plaintiff's trademark infringement and unfair competition claims based on 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

## IV.   DISCUSSION

### A.   LIKELIHOOD OF SUCCESS ON THE MERITS

*1. Whether 7-Eleven is Likely to Succeed on its Claim that It Had Good Cause to Terminate the Franchise Agreement*

Here, success on the merits depends on whether Plaintiff terminated the Franchise Agreement for good cause.  Plaintiff argues that KRSM's pattern of repeated breaches of the Franchise Agreement satisfies the New Jersey Franchise Practices Act's ("NJPFA") good cause requirement. (Moving Br. at 7.)  Plaintiff cites the seven breach notices KRSM received for failure to maintain the required minimum net worth requirement. (*Id.*)  Plaintiff argues that courts in other jurisdictions have specifically found that a 7-Eleven franchisee's failure to maintain the minimum net worth requirement of the Franchise agreement constitutes good cause for termination under analogous statutory schemes. (*Id.* at 8.)

Defendants cite another motivation for 7-Eleven's dissatisfaction.  They contend that in November of 2020, Kazmi and 7-Eleven attempted to negotiate a buyout agreement. (Opp'n Br. at 3.)  The parties, however, did not come to an agreement. (*Id.* at 5.)  Defendants argue that the

9

Store did not receive any breach notices prior to Kazmi's rejection of 7-Eleven's buyout proposal. (*Id*. at 11.)   Defendants further argue that KRSM substantially complied with the Franchise Agreement.  (*Id*. at 9.)  Defendants assert that 7-Eleven only contends that KRSM violated merely five requirements of the 249-page Franchise Agreement over the course of nearly two years.  (*Id*. at 10.)  Defendants maintain that even if the Notices of Material Breach were accurate, KRSM would still have been in substantial compliance with the Agreement over the course of a two-year time period.  (*Id*. at 11.)  Defendants argue that the alleged minimum net worth violations do not constitute good cause for termination.   Defendants maintain that accounting for "Missed Inventory" would not have resulted in the Store meeting the minimum net worth requirement.  (*Id*. at 13.)   Defendants further argue that the alleged cleanliness, out-of-stock, and food service violations additionally do not constitute good cause for termination.  (*Id*. at 16.)

In reply, Plaintiff reiterates that the termination of the Franchise Agreement was proper under the NJFPA.  (Reply Br. at 5.)  Plaintiff counters that substantial compliance is "not a numbers game where a franchisee 'substantially complies' if it is complying with more obligations under the Franchise Agreement than it is breaching."   (*Id*. at 6.)   Plaintiff asserts that substantial compliance under the NJFPA does not require "absolute adherence to every nuanced term of an agreement," but at a minimum, requires that a franchisee 'refrain from acting in direct defiance of a term of the Agreement.'" (*Id*. at 7.) (citing *General Motors Corp. v. New A.C. Chevrolet*, 263 F.3d 296 (3d Cir. 2001).)  Plaintiff further contends that Defendants' claims of pretext are factually baseless and legally irrelevant.  (*Id*. at 10.)

The NJFPA requires that written notice setting forth all the reasons for termination of a franchise be sent to the franchisee at least 60 days in advance of termination.  N.J.S.A. 56:10–5. NJFPA also provides that a franchisor cannot terminate a franchise without "good cause" and

10

describes "good cause" as "failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." *Id*. Substantial compliance is something less than absolute adherence to every nuanced term of an agreement that "at a minimum—requires that the franchisee refrain from acting in direct defiance of a term of the franchise agreement." *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 91 F. Supp. 2d 733, 740 (D.N.J. 2000). This is especially true when the franchisee has received specific notice from the franchisor that its behavior is a violation of the agreement. *Id.*; *see also Dunkin' Donuts v. Middleton Donut Corp.,* 100 N.J. 166 (1985) (upholding trial courts' finding that franchisee's deliberate underreporting of sales "amounted to substantial non-compliance with his franchising responsibilities so that good cause for termination existed").

Defendants claim that Plaintiff cannot establish a likelihood of success on the merits because Plaintiff did not have good cause to terminate the Franchise Agreement. (Opp'n Br. at 9.) 7-Eleven, however, established that it likely did have good cause for terminating Defendants' franchise. 7-Eleven claims it terminated the Franchise Agreement because Defendants were in continued non-compliance with the Franchise Agreement. (Moving Br. at 7.) Specifically, from January 28, 2021 through September 21, 2022, Defendants were issued nineteen Notices of Material Breach, seven of which were for violating the minimum net worth requirement. (*See* ECF No. 1-2.)

Defendants fell below the minimum net worth requirement by over $20,000 for most of minimum net worth violation notices. (*See* ECF No. 1-2.) In fact, all seven Notices of Material Breach for violations of the minimum net worth requirement indicated that the Store's net worth fell well below zero dollars. (*See* Breach Notice Nos. 1, 5, 6, 10, 15, 16; *see also* Termination Notice.) Defendants claim that 7-Eleven failed to account for $21,138.00 worth of inventory in

11

its calculation of the Store's net worth on all occasions where breach notices were issued.  (Opp'n Br. at 13.)  Defendants contend that if 7-Eleven accounted for all the missed inventory, the Store would have met the minimum net worth requirement.  (*Id*.)  However, even if 7-Eleven had counted for the alleged $21,138.00 in inventory, Defendants would have still fallen under the minimum net worth requirement on four separate occasions.  (*See* Breach Notice Nos. 5, 6, 10, 15.)

Furthermore, even if Defendant is correct in asserting that 7-Eleven wrongfully issued breach notices for its minimum net worth violations, 7-Eleven issued twelve separate notices of material breach, irrespective of the minimum net worth violations.  (*See* ECF No. 1-2.)  Plaintiff issued material breach notices for cleanliness violations on five separate occasions: Breach Notice Nos. 2, 4, 8, 14, and 18.  Defendants contend that the notices provide very little detail of the alleged cleanliness issue.  (Opp'n Br. at 17.)  Based on this record, Defendants are simply incorrect; each of the Breach Notices identifies specific instances of un-cleanliness.  For example, Breach Notice #2 provides a list of certain items within the Store that were found to be "unclean" (i.e., "stains on pavement," "unclean restroom," "unclean coffee makers," etc.).  Additionally, most recently, Breach Notice #18 also listed specific unclean conditions including "trash and litter outside not picked up", "dirty shelving around store", "rodent droppings on shelving", etc.  The five notices of material breach for uncleanliness were issued between  January 28, 2021 and September 21, 2022.  The Franchise Agreement explicitly states that 7-Eleven may terminate the Franchise Agreement upon Defendant's failure on four or more separate occasions within any twenty-four consecutive month period to comply with the terms of the Franchise Agreement, whether or not Defendants corrected the failures after delivery of a notice of breach.  (Franchise Agreement § 26(a)(10).)  Further, Defendants agreed, per the Franchise Agreement, that violating the four

notice-per-24-month provision was a material breach and "constitutes good cause for termination." (*Id*. § 26(a).)    The cleanliness violations alone fall within this material breach category. Accordingly, the Court finds that Defendant's violations of the cleanliness requirement of the Franchise Agreement (§20(a)) are grounds for good cause for termination.

Further, Defendants were additionally not operating the Store in accordance with the Franchise Agreement by failing to maintain stocking, carrying out-of-code products, and not meeting banking requirements. (*See generally* ECF No. 1-2.)  Because 7-Eleven can establish that Defendants were not acting in accordance with various terms of the Franchise Agreement, there is sufficient evidence to conclude that 7-Eleven will likely be successful in establishing that it terminated the Franchise Agreement for good cause under NJFPA.

### 2.  *Whether Plaintiff has a Likelihood of Success on the Breach of Contract Claims*

7-Eleven separately argues that it will succeed on its breach of contract claims and is entitled to possession of the Store.  (Moving Br. at 9.)  7-Eleven maintains that the Franchise Agreement provided that Defendants were required to immediately surrender the premises and equipment to 7-Eleven upon termination of the Franchise Agreement.  (*Id*.)  7-Eleven asserts that despite lawfully terminating the Franchise Agreement, Defendants refuse to perform their post-termination obligations under the Franchise Agreement including their obligations to immediately deliver and surrender full and complete possession of the Store, Equipment, and inventory.  (*Id*. at 10.)  7-Eleven maintains that Defendants' refusal to leave the premises and their continued operation of the Store violates the exclusive use obligation of the lease provisions of the Franchise Agreement.  (*Id*.)

13

In opposition, Defendants only address the issue of whether Plaintiffs terminated the Franchise Agreement with good cause and do not address whether Plaintiffs will succeed on their breach of contract claims.

To state a prima facie case for breach of contract, a plaintiff must plead: (1) "that the parties entered into a contract containing certain terms"; (2) "that [the plaintiff] did what the contract required [her] to do"; (3) "that [the defendant] did not do what the contract required [it] to do, defined as a breach of the contract"; and (4) "that [the defendant's] breach, or failure to do what the contract required, caused a loss to the plaintiff." *Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482 (2016) (internal quotation marks omitted) (citation omitted).

Here, the parties have a signed Franchise Agreement. (*See* Franchise Agreement at 37.) Pursuant to the Franchise Agreement, the parties agreed that Defendants would immediately surrender the premises and equipment to 7-Eleven upon termination of the Franchise Agreement. (*Id*. at § 28(a)(1).) Despite the termination of the Franchise Agreement, Defendants refuse to surrender the premises and equipment to 7-Eleven. Defendants' continued operation violates the exclusive use obligation of the lease provisions of the Franchise Agreement. (*See id*. at § 8(a).)

Accordingly, Plaintiff is likely to succeed on the merits of its breach of contract claims.

### 3.   *Whether Plaintiff has a Likelihood of Success on the Lanham Act Claims*

Plaintiff argues that the 7-Eleven Marks qualify for legal protection, and Defendants' continued use of its Marks after termination of the franchise agreement causes consumer confusion and constitutes trademark infringement under the Lanham Act. (Moving Br. at 13.)

To prevail on a claim for trademark infringement or unfair competition under the Lanham Act, the owner of a valid and legally protectable mark, such as 7-Eleven, must show that a defendant's use of a similar mark for its goods "causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir.2000). "Once a

franchise is terminated, the franchisor has the right to enjoin unauthorized use of its trademark under the Lanham Act." *S&R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 375 (3d Cir. 1992). In such cases, the "likelihood of confusion is inevitable." O*pticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990).

The Court has already determined that 7-Eleven terminated the Franchise Agreement. Despite such termination, Defendants continue to operate a convenience store bearing 7-Eleven's Marks. Accordingly, Plaintiff is likely to succeed on the merits of its Lanham Act claims.

## B.    IRREPARABLE HARM

Having shown a likelihood of success on the merits, 7-Eleven must also show that it will be irreparably injured by a denial of the preliminary injunction. When it comes to the second factor, irreparable harm, "[t]he law . . . is clear in this Circuit: in order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (internal quotation marks and citation omitted). Additionally, "[t]he 'requisite feared injury or harm must be irreparable–not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for it.'" *Id*. at 91–92 (quoting *ECRI v. McGraw-Hill, Inc*., 809 F.2d 223, 226 (3d Cir. 1987)).

7-Eleven argues that Defendants' continued possession and use of the premises and equipment deprives 7-Eleven, as the rightful owner, of the beneficial enjoyment of its property. (Moving Br. at 14.)

Defendants argue that it is difficult to understand how 7-Eleven can suddenly claim emergent, irreparable harm after waiting two years to come to Court. (Opp'n Br. at 8.)

15

In reply, 7-Eleven rejects Defendants' argument as "entirely disingenuous." (Reply Br. at 13.) 7-Eleven contends that the irreparable harm it continues to suffer is caused by Defendants' actions since 7-Eleven terminated the Franchise Agreement effective December 9, 2022. (*Id*.)

Generally, the deprivation of a party's right to possession and enjoyment of real property is an irreparable harm property remedied by injunctive relief. *Minard Run Oil Co. v. U.S. Forest Serv*., 670 F.3d 236, 256 (3d Cir 2011). Further, grounds for irreparable injury include a "loss of control of reputation, loss of trade, and loss of goodwill." *S&R Corp*, 968 F.2d at 378; *see also Opticians*, 920 F.2d at 195. In fact, damages caused by trademark infringement are by their very nature irreparable. *S&R Corp*., 968 F.2d at 378 (citing *International Kennel Club, Inc., v. Mighty Star, Inc*., 846 F.2d 1079, 1092 (7th Cir. 1988)).

After terminating the Franchise Agreement, Defendants were required to surrender the Store's premises. Defendants, however, have refused to do as such. Defendants continue operating the Store using 7-Eleven's Marks and holding the Store out as a 7-Eleven Store. Accordingly, the Court finds that 7-Eleven satisfies the irreparable harm requirement in that it is unable to possess and enjoy the premises in which Defendants refuse to surrender, and that Defendants continue to infringe 7-Eleven's Marks.

Further, the Court rejects Defendants' argument that Plaintiff waited over two years before filing for injunctive relief. Courts have regularly found that "a Plaintiff's delay in seeking preliminary injunctive relief is evidence that speedy relief is not needed*." EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, Civ. No. 05-5259, 2006 WL 892718, at *12 (D.N.J. Apr. 4, 2006); *Lanin v. Borough of Tenafly*, No. 12-3399, 2013 WL 936363, at *3 (3d Cir. Mar. 12, 2013) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights . . . [and] [d]elay[s] in seeking enforcement of

16

those rights . . .tends to indicate at least a reduced need for such drastic, speedy action.") (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985)) (internal citations omitted). The period of delay begins to run "once the plaintiff has actual or constructive knowledge of the [d]efendant's use of infringing marks." *EMSL Analytical, Inc.*, 2006 WL 892718, at \*12.

Here, Plaintiff had actual knowledge that Defendants were infringing 7-Eleven's Marks upon Defendants' refusal to surrender the premises on December 9, 2022. Plaintiffs promptly filed the instant Motion on December 13, 2022, merely five days later. The Court therefore rejects any argument that Plaintiff delayed seeking preliminary injunctive relief.

### C.   THE POSSIBILITY OF HARM TO OTHER INTERESTED PERSONS

The third factor requires the court to "balance the parties' relative harms; that is, the potential injury to the plaintiffs without this injunction versus the potential injury to the defendant with it in place." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017).

At this stage, a court should also consider "the possibility of harm to other interested persons from the grant or denial of the injunction." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (internal citations and quotations omitted.) Additionally, in this Circuit, "a party's self-inflicted harm by choosing to stop its own performance under the contract and thus effectively terminating the agreement is outweighed by the immeasurable damage done to the franchisor of the mark." *See Pappan Enter., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998); *see also S&R Corp.*, 968 F.2d at 379; *Opticians,* 920 F.2d at 197.

Granting the instant preliminary injunction has the possibility of harming the Defendants in that they will be required to surrender their business interest to 7-Eleven. Defendants, however, do not present any argument of potential damages that would result in the event the Court issued a preliminary injunction. Further, Defendants' harm is self-inflicted, as they chose to stop

17

complying with the Franchise Agreement.  Accordingly, the Court finds this factor weighs in favor of a preliminary injunction.

### D.    PUBLIC INTEREST

Finally, the Court must weigh whether the public interest favors the surrender of Defendants' property pending the outcome of this litigation.  "As a practical matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."  *American Tel. & Telegraph Co. v. Winback & Conserve Program, Inc*., 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

Here, the Court finds that "the public interest is best served by holding Defendants to the terms of the Franchise Agreement."  *Jackson Hewitt, Inc. v. DJSG Utah Tax Serv., LLC*, Civ. No. 10-5108, 2011 WL 90311, at *6 (D.N.J. Jan. 10, 2011).   Defendants fail to assert any countervailing public interest concerns.  Under the circumstances, the Court therefore finds that the public interest favors granting Plaintiff's motion for a preliminary injunction.

### E.    FED. R. CIV. P. 65(C)

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined or restrained."  Fed. R. Civ. 65(c); *Tilden Recreational Vehicles, Inc. v. Belair*, 786 F. App'x 335, 343 (3d Cir. 2019).  The amount of a bond is within the discretion of the court.  *Hoxworth v. Blinder, Robinson, Co., Inc*., 903 F.2d 186, 210 (3d Cir. 1990); *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988).

Here, 7-Eleven proposes a security of "no less than $50,000."  It contends this should suffice, given that the Store's financial records, indicate that it had a net income of negative $71,050.17 for the first eleven months of 2022.  Defendants have taken no position on the amount

18

of the bond.  Based on this record, the Court finds a $50,000 security bond is reasonable and adequate.

## V.      CONCLUSION

For the reasons set forth above, Plaintiff's Motion for a Preliminary Injunction will be GRANTED.  An appropriate order will follow.

Date: **March 9, 2023**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

19